**COMPUTER ASSOCIATES INTERNATIONAL, INC., Plaintiff,**

v.

**AMERICAN FUNDWARE, INC., Defendant.**

Civ. A. No. 86–K–2562.

United States District Court, D. Colorado.

Aug. 26, 1993.

Douglas Bragg, Bragg, Baker & Cederberg, Denver, CO, for plaintiff.

Jane Michaels, Steven Choquette, Holland & Hart, Denver, CO, for defendant.

## ORDER ON PENDING MOTIONS

KANE, Senior District Judge.

This is a diversity action based on the alleged plagiarism of computer software. It is set for a ten-day jury trial commencing September 13, 1993. Four motions are pending in this case: (1) Plaintiff's motion for summary judgment on Defendant's counterclaims, (2) Defendant's second motion for reconsideration of my ruling permitting amendment of the pretrial order, (3) Plaintiff's motion in limine, and (4) Defendant's motion in limine. I first review the facts and procedural history of this case.

### I. *Facts and Procedural History.*

On May 25, 1979, Stuart P. Orr & Associates, Inc. ("SPO") and Steamboat Computer Services ("SCS"), predecessors in interest to the parties in this case, entered into a Computer Software Agreement (the "1979 Agreement"), whereby SPO agreed to provide SCS with certain accounting software. The 1979 Agreement placed several limitations on SCS' use of the software. All materials provided under the 1979 Agreement were designated as trade secrets that could not be reproduced without SPO's written consent, SCS was prohibited from using the software to go into the software business (i.e., to sell to entities other than end-users), SCS was to obtain SPO's consent before converting the software to a different computer type, SCS was to pay SPO royalties on sales of the software after the first ten installations, and SPO retained exclusive rights to market the software in Southern California. (*See* Am. Compl., Ex. A.)

Under the 1979 Agreement, SCS paid $21,-671.75 for the six programs that SPO delivered (the "SPO programs"). In the next few years, SPO also provided SCS with updates of the SPO programs. No royalties were ever paid to SPO under the 1979 Agreement. Plaintiff Computer Associates International,

Inc. ("CA") acquired SPO in 1983. Defendant American Fundware, Inc. ("AFW") became successor-in-interest to SCS.

In August 1986, AFW notified CA that it was terminating the 1979 Agreement because it was no longer using the SPO programs. After examining the software that AFW was then marketing, known as PC–Fund, CA came to believe that AFW had usurped its code in developing this software. (Later, CA reached the same conclusion as to software known as Fundware). On December 19, 1986, CA filed this lawsuit, alleging claims for breach of contract and misappropriation of trade secrets and seeking injunctive relief and punitive damages.[1] AFW answered on February 2, 1987, asserting counterclaims for unfair competition and for "groundless and frivolous claims." On March 31, 1987, CA was permitted to supplement its complaint to assert a claim for copyright infringement. It withdrew this claim in an amended complaint filed on August 26, 1991.

On July 10, 1987 the court entered a protective order limiting disclosure of trade secrets and other information revealed through discovery.[2] On October 26, 1987, CA moved for entry of a default judgment against AFW because AFW had destroyed the original source code used to develop the PC–Fund and Fundware software after this action was filed, making it nearly impossible for CA to prove that AFW had plagiarized its software. Judge Carrigan granted the motion and entered a default judgment against AFW as to liability only on December 6, 1990. He found that AFW had

> intentionally destroyed portions of the source code not only after being served in this action and thus put on notice that the source code was irreplaceable evidence, but even after the request for production and motion to compel had dramatically and

specifically emphasized the significance of the code versions being destroyed as evidence.

(Mem.Op. & Order at 6.)

On November 26, 1991, AFW moved for sanctions against CA, claiming that CA had lost or destroyed all versions of the SPO programs provided to AFW's predecessor in 1979. On December 6, 1991, the court entered an order setting aside the default judgment against AFW on the grounds that CA had concealed that it, too, had lost or destroyed critical evidence and thereby misled the court into granting the default judgment. The matter was then set for jury trial on November 9, 1992.

On October 25 and 26, respectively, AFW and CA each filed motions in limine. Before these motions were heard, CA moved to disqualify Judge Carrigan, and he transferred the case to me. After the transfer, CA moved to amend the pretrial order to delete any reference to it having lost the SPO programs, since it discovered the original version of the programs in a mis-labeled storage box and provided it to AFW in February, 1993. I granted the motion, and AFW moved to reconsider. On April 22, 1993, I granted the motion to reconsider, reaffirmed my ruling permitting amendment of the pretrial order and granted AFW additional discovery until July 1, 1993. AFW again moved to reconsider.

Finally, on July 23, 1993, CA moved for summary judgment on AFW's counterclaims for unfair competition and groundless and frivolous claims, arguing they were barred by the *Noerr–Pennington* doctrine as recently clarified in the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* — U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

---

1. In addition to AFW, CA named as defendants Richard Yeager, AFW's president, and Jerome C. Dayton, AFW's vice-president. CA dismissed its claims against these individuals in December, 1991.

2. At various times, both sides to this dispute moved for the entry of sanctions. AFW also moved to add a counterclaim based on CA's alleged violation of the protective order. Judge Carrigan deferred these motions until after trial but apparently advised the parties they could file independent suits for violation of the protective order. They did. *See Computer Assocs. Int'l, Inc. v. Flagship Group,* No. 92–K–1660; *American Fundware, Inc. v. Computer Assocs, Int'l, Inc.,* No. 92–K–1185. On April 28, 1993, the parties stipulated to the dismissal of these suits and the withdrawal of any motions for sanctions pending in this case.

## II. *Pending Motions.*

### A. *Plaintiff CA's Motion for Summary Judgment.*

#### 1. *Does the Noerr–Pennington Doctrine Apply?*

■ I first consider CA's motion for summary judgment on AFW's counterclaims for unfair competition and frivolous and groundless claims because it is dispositive of other issues. CA argues that both of these claims are barred by the *Noerr–Pennington* doctrine. *See United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastman R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Under this doctrine, "[those who petition government for redress are generally immune from antitrust liability." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, —— U.S. at ——, 113 S.Ct. at 1926; *see also Oberndorf v. City & County of Denver*, 900 F.2d 1434, 1440 (10th Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

■ The right to petition government includes within its scope litigating activity. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). In the adjudicatory setting, the *Noerr–Pennington* doctrine protects a litigant from antitrust liability unless his opponent can establish that the litigant's case is a sham. To do this, the opponent must first show that the lawsuit is "objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits." *Professional Real Estate Investors*, —— U.S. at ——, 113 S.Ct. at 1928. If opponent succeeds in this first step, then and only then may the court examine the litigant's subjective motivation to determine whether the "baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor.'" *Id.* (citing *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533.

As AFW notes in its response, CA glosses over an important threshold question: whether the *Noerr–Pennington* doctrine bars not only federal antitrust claims under the

Sherman Act, but also tort claims under state law, such as the unfair competition and frivolous lawsuit claims at issue here. CA cites one case in its opening brief, *Aydin Corporation v. Loral Corporation*, in which the Ninth Circuit affirmed the dismissal of a federal antitrust claim and two pendent state law claims, including one for unfair competition. *See* 718 F.2d 897 (9th Cir.1983). A close reading of that case, however, does not indicate whether the dismissal of the unfair competition claim was under the *Noerr–Pennington* doctrine or by application of state law. The court simply stated: "As we concluded in connection with Aydin's *Noerr–Pennington* claim, *see* part IV, *supra*, whether the state actions were a sham or a genuine effort by Loral and Conic to obtain redress is a factual issue and, based upon the record before us, Aydin failed to raise an issue of material fact." *See id.* 718 F.2d at 905.

AFW, on the other hand, relies on a decision from this district, *Ball Corporation v. Xidex Corporation*, 705 F.Supp. 1470 (D.Colo.1988). AFW argues that the court in *Ball* refused to apply the doctrine to bar a claim based on the tort of unfair competition. This is not a correct statement. In fact, the court, while skeptical that the doctrine applied, eschewed the issue in *Ball* because the parties had not adequately briefed it. *See id.* at 1472. Nevertheless, the court assumed for the purpose of argument that the *Noerr–Pennington* doctrine *did* apply, but held that the plaintiff had satisfied the requirements for the sham litigation exception to the doctrine. *Id.* Therefore, *Ball* provides little authority for the proposition that *Noerr–Pennington* immunity cannot be extended to a defendant in an unfair competition claim.

Alternatively, AFW posits a fairly elaborate argument that the principles underlying the doctrine are rooted in antitrust law and cannot be extended to other contexts. AFW relies on reasoning in the *California Motor Transport* and *Noerr* cases balancing First Amendment principles against the interests protected by federal antitrust law. *See California Motor Transp.*, 404 U.S. at 510, 92 S.Ct. at 611; *Noerr*, 365 U.S. at 137, 81 S.Ct. at 529. It goes on to argue that, because the tort of unfair competition is fundamentally

different from a federal antitrust violation, "the *Noerr–Pennington* doctrine cannot be automatically applicable to the common law tort of unfair competition." (Br. Opp'n Pl.'s Mot.Summ.J. at 11.) I disagree with this conclusion.

First, in fairness to AFW, few courts have carefully analyzed this issue. As the court observed in *Salomon S.A. v. Alpina Sports Corporation:*

> [I]t is not settled that the *Noerr–Pennington* doctrine provides immunity from unfair competition claims. The *Noerr–Pennington* trilogy—*Noerr Motor Freight, Pennington,* and *California Motor Transport*—apply the doctrine only in the context of antitrust claims asserted under authority of the Sherman Act, 15 U.S.C. § 1, *et seq.* Alpina does not invoke the Sherman Act, but instead predicates its claim on a common-law unfair competition theory.
>
> Some courts have applied *Noerr–Pennington* to dismiss common-law claims related to unfair competition. But none of these courts grappled with the issue; each assumed that *Noerr–Pennington* applied to common-law claims as well as statutory antitrust claims.

737 F.Supp. 720, 724 (D.N.H.1990). Rather than analyzing the issue itself, however, the court in *Salomon* followed the same approach as *Ball,* assuming for the sake of argument that the doctrine applied to Alpina's counterclaim for unfair competition but holding it had presented sufficient evidence that Salomon's action was a sham. *See id.* 737 F.Supp. at 724–25.

Despite the lack of reasoned authority on this question, there are numerous federal, district and state court cases in which the *Noerr–Pennington* doctrine has been applied to non-antitrust claims. *See, e.g., South Dakota v. Kansas City S. Indus., Inc.,* 880 F.2d 40, 50–53 (8th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990); *Sierra Club v. Butz,* 349 F.Supp. 934,

938–39 (N.D.Cal.1972); *Pacific Gas & Elec. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 270 Cal.Rptr. 1, 9–11, 791 P.2d 587, 595–97 (1990) (citing cases). These courts recognize that, while the doctrine arose in connection with antitrust cases, it is fundamentally based on First Amendment principles. More than one court has held that the doctrine "is a principal of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, *regardless of the underlying cause of action asserted by the Plaintiffs.*" *Azzar v. Primebank, FSB,* 198 Mich.App. 512, 499 N.W.2d 793, 796 (1993) (citing *Webb v. Fury,* 167 W.Va. 434, 282 S.E.2d 28, 36–37 (1981)). While criticized as overbroad, *see, e.g.,* Robert A. Zauzmer, Note, *The Misapplication of the Noerr–Pennington Doctrine in Non–Antitrust Right to Petition Cases,* 36 Stan. L.Rev. 1243, 1258 (1984), recent Supreme Court guidance lends credence to this view.[3]

In *Professional Real Estate Investors,* the Supreme Court established the requirements for the sham exception to the *Noerr–Pennington* doctrine. In its analysis, the Court wrote: "Whether applying *Noerr* as an antitrust doctrine *or invoking it in other contexts,* we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." —— U.S. at ——, 113 S.Ct. at 1927 (emphasis added). This statement indicates the Court's view that *Noerr–Pennington* is not limited to the antitrust arena. In support, the court cited, among other cases, *NAACP v. Claiborne Hardware Company,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

In *Claiborne Hardware,* the NAACP organized a boycott of white-owned businesses in Claiborne County, Mississippi when their demands for racial equality fell on the deaf ears of white elected officials. The business owners successfully sued the NAACP and other individuals for damages and injunctive relief on three state law conspiracy theories, including one based on the tort of malicious

---

**3.** On the other hand, the *Noerr–Pennington* doctrine has been advocated as a first-line defense to "SLAPP" suits, an acronym coined by University of Denver Professors Penelope Canan and George Pring for Strategic Lawsuits Against Public Participation. *See generally* Thomas A. Waldman, Comment, *SLAPP Suits: Weaknesses in First Amendment Law and in the Court's Responses to Frivolous Litigation,* 39 UCLA L.Rev. 979 (April 1992).

interference with business interests. *Id.* at 891, 102 S.Ct. at 3414. The tort judgment was upheld by the Mississippi Supreme Court. The United States Supreme Court reversed, holding that the defendant's non-violent boycott activities—"speech, assembly, association and petition"—were protected by the First Amendment. *Id.* at 911, 102 S.Ct. at 3424. It relied heavily on *Noerr*:

It is not disputed that a major purpose of the boycott in this case was to influence governmental action. Like the railroads in *Noerr,* the petitioners certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign. Unlike the railroads in that case, however, the purpose of petitioners' campaign was not to destroy legitimate competition. Petitioners sought to vindicate rights of equality and freedom that lie at the heart of the Fourteenth Amendment itself. The right of the States to regulate economic activity could not justify a complete prohibition against a non-violent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself.

*Id.* 458 U.S. at 914, 102 S.Ct. at 3426.

 Thus *Professional Real Estate Investors* and *Claiborne Hardware* support the proposition that *Noerr–Pennington* immunity is a constitutional, not an antitrust, doctrine. Moreover, ignoring principles of federalism and taking the questionable approach of one court, which viewed this as an issue of state law, *see Florida Fern Growers Association v. Concerned Citizens,* 616 So.2d 562, 568 (Fla.App.1993), the result is the same. Colorado courts have twice applied the *Noerr–Pennington* doctrine to bar state law claims. *See Protect Our Mountain Env't, Inc. v. District Court,* 677 P.2d 1361, 1365–66 (Colo.1984) (applying doctrine to abuse of process and civil conspiracy claims); *Anchorage Joint Venture v. Anchorage Condominium Ass'n,* 670 P.2d 1249 (Colo.App.1983) (upholding dismissal of negligence, abuse of process and tortious interference with business expectancy claims). Consequently, I hold that the *Noerr–Pennington* doctrine is appli-cable to AFW's counterclaim for unfair competition.

 The same result does not hold as to AFW's counterclaim for "groundless and frivolous" litigation under Colo.Rev.Stat. § 13–17–101 to –103 (1987). Under this statute, a court may award attorney fees against a litigant whose claims are frivolous or groundless. Apparently, it applies in diversity cases. *See Seismic Int'l Research Corp. v. South Ranch Oil Co.,* 793 F.2d 227, 232 (10th Cir.1986), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1297, 94 L.Ed.2d 153 (1987); *Harrison v. Luse,* 760 F.Supp. 1394, 1401 (D.Colo.), *aff'd,* 951 F.2d 1259 (10th Cir.1991).

 CA offers no explanation why the *Noerr–Pennington* doctrine bars this counterclaim. In fact, although denominated as a separate counterclaim, it is, in effect, only a request that the court consider whether to impose sanctions against CA for asserting claims lacking substantial justification, which the court may do on its own motion or at the request of a party. *Township Homeowners Ass'n, Inc. v. Arapahoe Roofing & Sheet Metal Co.,* 844 P.2d 1316, 1318 (Colo.App. 1992). "[A]n award is contingent on proof that a claim/defense was, indeed, substantially frivolous and/or groundless." *Id.* This assessment depends on whether there was any credible evidence to support the claim *at trial. Colorado Supply Co. v. Stewart,* 797 P.2d 1303, 1307 (Colo.App.1990). Because an award of attorney fees under the Colorado statute is contingent on there being no evidence at trial, it does not infringe on the right to petition government protected by the *Noerr–Pennington* doctrine. Thus, while CA may obtain the dismissal of AFW's counterclaim under the *Noerr–Pennington* doctrine, it cannot preclude scrutiny of its own claim under the standards of Colorado's attorney fee statute. Therefore, I find that AFW's request for attorney fees is not barred.

2. *Application of the "Sham" Exception.*

CA is entitled to immunity on AFW's counterclaim for unfair competition unless AFW can demonstrate that CA's litigation is a sham. To do this, AFW must first show that CA's claims are "objectively baseless." *Professional Real Estate Investors,* —— U.S. at

——, 113 S.Ct. at 1928. Only then is evidence of CA's subjective intent in suing AFW relevant. *Id.* In *Professional Real Estate Investors,* this determination was more simple because the predicate facts of the underlying lawsuit were not disputed and summary judgment had been entered against the plaintiff. *See id.* at ——, 113 S.Ct. at 1930. Here, however, the predicate facts of CA's claims are hotly disputed. Nevertheless, applying the standards on summary judgment, AFW has failed to show that CA's litigation is a sham.

Under the first prong of the *Noerr–Pennington* analysis, AFW puts forth two reasons CA's claims are objectively baseless. First, it argues that CA does not own the SPO programs; instead, it claims they are owned by the independent contractors hired to produce them. Second, AFW argues that because CA's predecessor did not label the SPO programs as trade secrets when providing them to AFW or other licensees, it cannot claim them as proprietary. It cites the deposition of two of CA's witnesses to establish that the SPO programs were developed by independent contractors and that SPO did not label the programs as trade secrets.

■ AFW's first argument is a red herring. To support its contention, AFW relies on *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). In that case, the Supreme Court held that an independent contractor who produced certain artwork was its author and could claim copyright ownership. *Id.* at 753, 109 S.Ct. at 2179. Although status as an employee or an independent contractor is relevant to the ownership of a copyright, it is irrelevant to the ownership of a trade secret. These concepts of intellectual property are different. *See Southern Miss. Planning & Dev. Dist., Inc. v. Robertson,* 660 F.Supp. 1057, 106187065564 (S.D.Miss.1986)

(copyright protection extends to the particular expression used by the author; trade secrets are the very ideas of the author.) Under the common law of trade secrets,

> If an employer pays you to design, the employer owns the fruit of your labor. This common law ownership rule clearly applies to employee ideas and developments which meet the definition of a trade secret, even in the absence of a written contract. . . .
>
> The rule is now even extended to non-employment situations, such as when an independent contractor is hired to design or develop a process or machine. Such a contractor is equivalent to an employee hired to develop an idea, so that the results of this work are owned by the hiring company.

2 Melvin F. Jager, *Trade Secrets Law* § 8.01[1] at 8–2 to –3 (1993); *see, e.g., Lamb–Weston, Inc. v. McCain Foods, Ltd.,* 941 F.2d 970, 972–73 (9th Cir.1991) (affirming grant of preliminary injunction to potato processor holding trade secret in blade system developed by independent contractor).[4]

■ Likewise, AFW's contention that CA lost its trade secrets because its predecessor did not label the materials it delivered to AFW and other licensees as such is not dispositive. The issue is whether CA and its predecessor took reasonable measures under the circumstances to protect against unauthorized disclosure of the secrets. *Colorado Supply Co.,* 797 P.2d at 1306. Whether the programs themselves were marked confidential is only one factor to be considered. Distribution of software under other confidential restraints may also suffice. *See, e.g., Continental Data Sys. v. Exxon Corp.,* No. 84–2538, 1986 WL 20432, at *2 (E.D.Pa. June 30, 1986) (agreement requiring customers to treat software manual as confidential and practice of distributing software by license

---

4. Moreover, even if the "work for hire" concept applies in trade secret misappropriation cases, these deposition excerpts do not conclusively establish whether the persons that SPO hired to do "grunt coding" and other programming were employees or independent contractors. *See Community for Creative Non–Violence,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79 (listing factors court must consider to determine whether a

hired party is an employee). Assuming they were independent contractors, SPO does not necessarily lose all ownership in the SPO programs. *See id.* at 738, 753, 109 S.Ct. at 2171, 2179 (employer of independent contractor owns copyright in specially commissioned work and joint copyright in work merged into inseparable parts of a unitary whole.)

sufficient to safeguard trade secrets); *Management Science of Am., Inc. v. Cyborg*, 6 Comp.L.Serv.Rep. 921, 924–25 (Callaghan) (N.D.Ill.1978) (distribution of software to six hundred licensees does not as a matter of law establish public dissemination of trade secrets). Furthermore, the 1979 Agreement provided that "all materials supplied by SPO are proprietary and trade secrets and are of considerable value. They cannot be reproduced without express written consent of SPO." (Am.Compl., Ex. A at 1.) In addition, AFW and its predecessor were to exercise control over their employees and sublicensees to protect the integrity of the 1979 Agreement, and CA and its predecessor were given certain rights to ensure compliance with the license.[5] Thus, there is evidence that CA and its predecessor took significant steps to protect these trade secrets. For these reasons, AFW has failed to show that CA's claims are objectively baseless, and it has failed to satisfy the first prong of the *Noerr–Pennington* sham exception.

Even assuming for the purpose of argument that AFW has shown that CA's litigation is objectively baseless, AFW has failed to produce any evidence, under the subjective prong of the sham exception, that CA intended to prejudice AFW's financial interests through this lawsuit. Anticipating AFW's attack, CA supports its motion for summary judgment with reference to the depositions of three officers or former employees of AFW. In their depositions, these witnesses fail to identify any factual basis for AFW's belief that CA is using this litigation for improper purposes, such as to extort a settlement, put AFW out of business or to usurp its market. AFW, in turn, relies on the affidavit of Richard Yeager, the former president of AFW, who relates only that the Chairman of CA told him that CA intended to sue so that CA's attorney, Steven Kahn, could build a new house.

■ AFW's evidence of CA's subjective intent is irrelevant. Yeager's affidavit goes to CA's intent to benefit from a favorable result of the litigation. Under the subjective prong of "sham" analysis, "the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'" *Professional Real Estate Investors,* —— U.S. at ——, 113 S.Ct. at 1928. Thus, AFW has failed to bring forth any relevant evidence to satisfy the second, subjective prong of the "sham" exception to *Noerr–Pennington* immunity. Accordingly, CA's motion for summary judgment on AFW's unfair competition counterclaim is granted.

**B.** *Defendant AFW's Motion to Reconsider Minute Order Modifying Pretrial Order.*

On April 5, 1993, I granted CA's motion to amend the pretrial order to reflect that CA had located the SPO programs it had provided to SCS under the 1979 Agreement. AFW moved for reconsideration of this order on April 21, 1993, or in the alternative, for the reopening of discovery, since up to this point it had proceeded on the assumption that the SPO programs were not available. I granted the motion to reconsider, reaffirmed my order permitting amendment of the pretrial order and reopened discovery until July 1, 1993.

On July 15, 1993, AFW filed the instant motion, again requesting reconsideration of my order amending the pretrial order. AFW argues that CA still has not produced a copy of the original programs provided under the 1979 Agreement, only a tape produced three months after the delivery would have taken place. It contends that "CA has never been able to produce a copy of the computer programs licensed to AFW in 1979, or an exact copy of any updated programs, despite its allegations that it was these programs that AFW allegedly copied, an allegation AFW vigorously denies." (Mot. Recons. at 4.) Therefore, it argues that the pretrial order should not be amended because the SPO programs are still lost.

---

5. CA argues that the same provisions were contained in all of its agreements with other licensees, and that the licensees were required to treat the SPO programs as proprietary and confidential. CA fails to support this contention with reference to any facts of record.

**1526**

CA's response to AFW's latest motion to reconsider is more precise. CA states that its predecessor, SPO, delivered the first version of the SPO programs, Version 1.0, in mid–1979. Thereafter, it delivered Versions 1.5, 2.0, 2.1 and 2.2, which were "bug fixes" and enhancements to the original software. CA acknowledges that it was unable to locate Version 1.0 during the original period of discovery in this case. It finally located this software in February 1993 and provided a copy to AFW. After AFW's expert analyzed the tape, he concluded that 79 of the 306 programs on the tape were in some way modified in October, 1979, after the original tape would have been supplied. CA argues that this fact should have no bearing on the case. CA seeks to put the blame on AFW, arguing that it did not save the original copies of the SPO programs either.

Whether to allow amendment of the pretrial order is a matter in my discretion. See *Joseph Mfg. Co. v. Olympic Fire Corp.*, 986 F.2d 416, 418 (10th Cir.1993). Modification should be permitted "when the danger of surprise is small and a failure to amend might result in an injustice to the moving party." 6A Charles A. Wright, *et al., Federal Practice and Procedure,* § 1527 at 287 (1990); *see also Hull v. Chevron U.S.A., Inc.,* 812 F.2d 584, 588 (10th Cir.1987).

In my mind, the dispute over CA's alleged loss of the SPO programs has grown out of proportion to its significance. To prove either of its claims, CA must show that AFW copied its software. It must make some comparison of its code and the code produced by AFW. If later versions of the SPO programs would indicate that copying took place, then CA has made out a prima facie case, regardless of Version 1.0. In fact, in the hearing on these motions, CA indicated this to be its strategy. To the extent CA may rely on Version 1.0 for some other purpose at trial, AFW has not been prejudiced. It has had an adequate opportunity to examine and conduct additional discovery on Version 1.0. Therefore, I deny AFW's most recent motion to reconsider.

*C. Plaintiff CA's Motion in Limine.*

*1. Evidence of the Parties' Financial Condition.*

CA's first contention in this motion in limine is that AFW should not be permitted to introduce evidence regarding either party's financial condition. Specifically, CA seeks disallowance of any reference to CA's size, wealth, or financial condition, including its Annual Report and Form 10–K. Likewise, with respect to AFW, CA argues that AFW should be prevented from introducing any evidence of its size, wealth or financial condition, including its income and financial statements. CA argues that this evidence would unfairly prejudice the jury under Fed. R.Evid. 403. AFW, not surprisingly, argues that evidence of both companies' financial condition is relevant to its counterclaim for unfair competition, CA's damages for breach of contract and misappropriation of trade secrets, its entitlement to punitive damages and its request for injunctive relief.

Since I grant summary judgment against AFW on its counterclaim for unfair competition, evidence of the parties' relative financial strength is no longer relevant to show CA's allegedly improper motives in bringing this litigation. Whether evidence of AFW's profits is relevant to the issue of CA's damages depends on the proper measure of damages in this case. AFW contends that CA's damages are measured by the profits AFW made in selling the PC–Fund and Fundware software allegedly containing CA's trade secrets. CA, on the other hand, asserts that AFW must be held responsible for the royalties provided for in the 1979 Agreement. CA has the better position.

The proper measure of damages for misappropriation of trade secrets case can be elusive, and courts are encouraged to be "flexible" and "imaginative." *University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 530 (5th Cir.1974).

Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put

the trade secret to the use the defendant intended at the time the misappropriation took place.

*Id.* at 539; *see also Vitro Corp. of Am. v. Hall Chem. Co.,* 292 F.2d 678, 683 (6th Cir. 1961). This is, in essence, the "reasonable royalty" rule, which most courts now apply in trade secret cases. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1128 (5th Cir.1991) ("[t]rade secret cases typically embrace some form of royalty"), *aff'd,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Metallurgical Indus., Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1208 (5th Cir.1986).

▮ Determination of a reasonable royalty is simplified in cases where there is already a royalty agreement in place. Hence, "the first inquiry of the courts generally has been whether there is any factual basis, such as a royalty agreement ... from which one might legitimately determine the value which the parties themselves actually assigned to the misappropriated information." Michael A. Rosenhouse, Annotation, *Proper Measure of Damages and Elements of Damages for Misappropriation of Trade Secrets,* 11 A.L.R.4th 12, § 2 at 20 (1982). If there is, the contractually established royalty will be the best measure of the parties' intent. *See University Computing,* 504 F.2d at 538 (damages subject to exact measurement where parties have agreed on licensing price); *Biodynamic Technologies, Inc. v. Chattanooga Corp.,* 658 F.Supp. 266, 269–70 (S.D.Fla.1987) (royalty in agreement served as exact measure of damages in trade secret case); *cf. Water Technologies V. Calco, Ltd.,* 714 F.Supp. 899, 904 n. 2 (N.D.Ill.1989) (in patent case, established royalty best measure of reasonable royalty). At minimum, it provides the baseline for a damages award. *See Mineral Deposits, Ltd. v. Zigan,* 773 P.2d 606, 608 (Colo.App.1988) (plaintiff in misappropriation of trade secrets case entitled to full measure of his loss, an amount no less than all profits the defendant realized from his tortious conduct); *cf. Nickson Indus., Inc. v. Rol Mfg. Co.,* 847 F.2d 795, 789 (Fed. Cir.1988) (reasonable royalty for patented equipment may be greater than an established royalty where widespread infringement makes established royalty artificially low).

Although there is no case law directly on point, two authorities support the application of the reasonable royalty rate under Colorado law. First, in *Management Recruiters of Boulder, Inc. v. Miller,* the court awarded damages in a trade secret claim based on a contractual liquidated damages provision, indicating Colorado courts would similarly enforce a contractual royalty provision governing trade secrets. *See* 762 P.2d 763, 766 (Colo.App.1988). Second, under current Colorado law, "[i]n lieu of damages measured by any other methods, the damages caused by a misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Colo.Rev.Stat. § 7–74–104(1) (1986). While this statute, Colorado's adoption of the Uniform Trade Secrets Act, does not apply because the misappropriation in this case occurred before the effective date of the Act, *see id.* § 7–74–101 editor's note, the Act nevertheless reflects "basic principles of common law trade secret protection" and "better reasoned cases concerning the remedies for trade secret misappropriation," and is persuasive evidence of the common law rule on damages in trade secret cases. *See* Uniform Trade Secrets Act, 14 U.L.A. 433, 434, 435 (1990) (prefatory note).

▮ For these reasons, I agree with CA that the "reasonable royalty" measure of damages applies in this case. Under this rule, the amount of royalties is determined on the basis of the volume of the defendant's actual sales of trade secret product. Michael A. Rosenhouse, *supra,* § 34. The defendant need not have actually turned a profit on that product. *See Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.,* 401 F.Supp. 1102, 1119 (E.D.Mich. 1975); 1 Melvin F. Jager, *supra,* § 7.03[2][a] at 7–59 ("The concept of 'use' of a trade secret by the misappropriator does not necessarily depend upon the generation of a dollar profit.") Here, if CA prevails on liability, it would be entitled to its contractual royalties measured by AFW's actual sales of the PC–Fund and Fundware software. Evidence of AFW's profits is therefore not rele-

vant to the calculation of CA's damages unless the contractual royalty is not a reasonable royalty because AFW's profits on these products were unusually high. CA does not claim this to be the case.

AFW further argues that Colorado law permits it to introduce evidence of its financial strength to aid the jury in assessing punitive damages, if any, relying on *Leidholt v. District Court,* 619 P.2d 768, 770 (Colo. 1980). CA disputes this contention, arguing that the case law upon which AFW relies was abrogated by Colorado law adopted several months before this case was filed. CA refers to § 13-21-102, which went into effect as to actions accruing on or after July 1, 1986. *See* Colo.Rev.Stat. § 13-21-102 editor's note (1986 Supp.). Under this statute, "[i]n any civil action in which exemplary damages may be awarded, evidence of the income or net worth of a party shall not be considered in determining the appropriateness or amount of such damages."[6] *Id.* Accordingly, evidence of AFW's financial condition is not relevant to the issue of punitive damages either.

■ Finally, AFW asserts that evidence of its financial condition is relevant to CA's claim for injunctive relief because this claim "must be evaluated on the economic consequence to AFW." (Def.'s Resp.Pl.'s Mot.Limine at 5.) Nevertheless, CA's claim for injunctive relief is a matter for my determination, not the jury's. Any financial data relevant to this claim will be presented to me after the jury reaches a verdict, not during trial. *Compare Nelson v. National Fund Raising Consultants, Inc.,* 64 Wash.App. 184, 823 P.2d 1165, 1169 (factors relevant to permanent injunction for trade secret misappropriation include the relative hardship likely to result to the defendant if injunction is granted), *aff'd in relevant part,* 120 Wash.2d 382, 842 P.2d 473 (1992) *with Rockwell*

*Graphic Sys., Inc. v. DEV Indus., Inc.,* No. 84 C 6746, 1993 WL 286484 at *6 (N.D.Ill. July 29, 1993) (result that defendant might be put out of business if injunction issued would be due to defendant's unlawful actions, not the court's legitimate exercise of its discretion in awarding equitable relief). For these reasons, CA's request for the preclusion of evidence of either party's financial condition is granted.

### 2. *Evidence that CA Lost the SPO Programs.*

■ CA next requests that I limit AFW from presenting any evidence at trial regarding CA's alleged "loss" of the earliest version of the SPO programs, Version 1.0. As noted before, CA has recovered a copy of Version 1.0, but 79 of the 306 programs therein were dated October 1979, indicating that these programs were in some way modified after SPO would have provided the SPO programs to AFW's predecessor in the summer of 1979.

AFW responds that evidence that CA lost the original version of the SPO programs is central to its case. It explains that, since CA copyrighted Version 1.0 of the SPO programs, they "have been publicly disclosed and contain no trade secrets." (Def.'s Resp. Pl.'s Mot. in Limine at 7.) On this assumption, if the later versions of the SPO programs contain much of the same code, these versions would likewise not be protected as trade secrets. Therefore, AFW argues, it must be able to compare Version 1.0 with the later versions and should be able to note the fact that it is unable to do so. Additionally, it argues that it should be entitled to a presumption that the lost version of the SPO programs would have been favorable to its case.

First, in the hearing on this motion, counsel for CA represented on the record that the

---

6. AFW argues that this statute does not apply because CA's cause of action accrued before its effective date. Under the common law "discovery rule" and the statute codifying it, *see* Colo. Rev.Stat. §§ 13-80-108(6), -108(8) (1987), CA's contract and tort claims accrued when it discovered or should have discovered through the exercise of reasonable diligence the breach of contract or tortious conduct giving rise to its claims.

Applying the rule to this case, CA's cause of action accrued in the fall of 1986, when it was able to make an actual comparison of its and AFW's code, leading it to believe that plagiarism had occurred. AFW's contention that this rule was not adopted as to contract or tort cases until July 1, 1987, after this case was filed, is simply incorrect. *See* Colo.Rev.Stat. § 13-80-108 (1986 Supp.).

tape used to copyright Version 1.0 was the same one provided to AFW for its inspection which contained the 79 updated programs. Therefore, AFW is simply not prejudiced by the alleged loss of earlier versions of these programs.

 Second, because this issue is recurring, I note that CA's assertion that the SPO programs are trade secrets is not necessarily inconsistent with their registration under the copyright laws. Copyrighting intellectual property does not automatically vitiate its trade secret status. *See generally,* 2 Melvin F. Jager, *supra,* § 10.02. CA copyrighted the SPO programs under a procedure permitting the registration of a copyright by limited deposit to protect trade secrets. *See* 37 C.F.R. § 202.20(c)(vii)(A)(2). Under this procedure, only a portion of the copyrighted code is actually on file with the Copyright Office. *Id.; see, e.g., Fonar Corp. v. Deccaid Servs., Inc.,* 983 F.2d 427, 428 (2d Cir.1993); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 825 F.Supp. 340, 354–56 (D.Mass. 1993).

 To prove that CA could no longer claim that the SPO programs were trade secrets, AFW would have to show that it or someone in the industry actually learned of CA's trade secrets by reviewing the limited information on file with the Copyright Office. *See Murray v. Bank One Columbus, N.A.,* 64 Ohio App.3d 784, 582 N.E.2d 1124, 1130 (1990). AFW has not preserved this issue in the pretrial order. It has argued only that CA's trade secret claim is preempted by the Copyright Act. (*See* Pretrial Order at 5.) That proposition fails as a matter of law. *See* 2 Melvin F. Jager, *supra,* § 10.02 at 10–12 (question of preemption of state trade secret law under Copyright Act moot after passage of 1980 revisions to Act); *cf. Gates Rubber Co. v. Bando Am., Inc.,* 798 F.Supp. 1499, 1520–22 (D.Colo.1992) (finding no preemption based on comparison of trade secret claims with copyright protection). Therefore, I grant CA's request that AFW be precluded from referring to CA's "loss" of Version 1.0. AFW shall be permitted, however, to note that 79 programs of Version 1.0 were updated in October 1987 to the extent this issue is otherwise relevant to AFW's defense.

### 3. CA's Waiver of Copyright Claim.

 CA argues that AFW should be precluded from mentioning CA's waiver of its copyright claim, as it would only confuse the jury about the remaining claims in this case. CA waived its copyright claim because at that time it was unable to locate the original tape of Version 1.0 which it copyrighted. AFW argues evidence of CA's waiver of its copyright claim is relevant because CA may not seek trade secret protection of copyrighted programs. As I note above, this is a dubious proposition. For other reasons, however, AFW's reliance on CA's withdrawal of its copyright claim. is misfocused.

Here, CA seeks to preclude evidence that it withdrew its copyright infringement claim, not evidence that it actually copyrighted the SPO programs. The two issues are distinct. Nothing prevents AFW from introducing evidence to show that CA copyrighted Version 1.0 of the SPO programs, so long as it is relevant to AFW's defense. Reference to CA's earlier complaint is unnecessary for this purpose and is improper. While inconsistent allegations in different lawsuits are admissible, such as where the plaintiff files separate lawsuits alleging different defendants were responsible for the same injuries, this rule does not apply to amended pleadings in the same lawsuit, as it interferes with the right to plead claims alternatively under Rule 8(e). *See Dugan v. EMS Helicopters, Inc.,* 915 F.2d 1428, 1431–34 (10th Cir.1990); *Garman v. Griffin,* 666 F.2d 1156, 1158–59 (8th Cir. 1981). Accordingly, CA's motion is granted as to evidence that it waived its copyright claim.

### 4. AFW Equitably Estopped from Contesting that SPO Programs are CA's Trade Secrets.

CA argues that AFW should be equitably estopped from contesting CA's claim that the SPO programs are trade secrets because AFW's predecessor acknowledged this in the 1979 Agreement. AFW responds that CA did not affirmatively plead equitable estoppel and has waived this defense. CA replies that

it was not required to plead this issue, since it arises in response to a defense raised by AFW. Disregarding CA's alleged failure to properly plead equitable estoppel, I find that the doctrine does not apply on these facts.

Under Colorado law, the doctrine of equitable estoppel is employed to prevent manifest injustice. *Committee for Better Health Care v. Meyer,* 830 P.2d 884, 891 (Colo.1992). In order for the doctrine to apply, the party to be estopped must know the true facts and intend that its conduct be acted upon by the party asserting the defense. *Dove v. Delgado,* 808 P.2d 1270, 1275 (Colo.1991). Thus, it focuses on one party's conduct or representations which induce another party, who does not know the true facts, to rely on the conduct or misrepresentations. *Id.; In re Marriage of Dennin,* 811 P.2d 449, 450 (Colo.App.1991).

Here, AFW signed a contract containing CA's representation that the SPO programs were trade secrets. CA is the party in possession of the true facts regarding its trade secrets, not AFW. It may not estop AFW. Nevertheless, CA argues that "numerous cases" have invoked the doctrine in these circumstances to bar a party from denying the existence of trade secrets. *But see Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis.2d 202, 267 N.W.2d 242, 249 (1978) (estoppel based on contractual acknowledgement of trade secret status not appropriate in restraint of trade case for public policy reasons). These cases are distinguishable. In two, the party estopped had actually developed the trade secrets sought to be protected. *See Ultra–Life Laboratories, Inc. v. Eames,* 240 Mo.App. 851, 221 S.W.2d 224 (1949) (defendant's poultry cull-

ing method); *Germo Mfg. Co. v. Combs,* 209 Mo.App. 651, 240 S.W. 872 (1922) (defendant's poultry tonic). Furthermore, in most of the cases upon which CA relies, *see also In re Uniservices, Inc.,* 517 F.2d 492 (7th Cir.1975), the court focused primarily on the defendant's conduct over several years in acknowledging the proprietary nature of the product or process. CA is not in a similar position here. Therefore, I deny CA's motion that AFW be equitably estopped from contesting the trade secret status of the SPO programs based on language in the 1979 Agreement.

### 5. *Reference to Injunctive Relief.*

CA's final request in this motion in limine is that AFW be precluded from mentioning CA's claim for injunctive relief since it is an equitable one for the court's determination. AFW responds that the jury must determine what, if any, portion of AFW's software contains CA's proprietary information so that the court can fashion the scope of the injunction. Therefore, AFW posits, the jury must be told that CA desires injunctive relief.

I disagree with AFW's position. To assess damages, the jury will no doubt be required to decide whether either the PC–Fund or Fundware programs, or both, were copied from CA's code. Then I will determine, if necessary, whether to enjoin AFW's distribution of PC–Fund or Fundware based on the jury's conclusions. The jury need not be advised of CA's equitable claim. Therefore, I grant the motion in limine as to reference to CA's claim for injunctive relief.[7]

7. CA raised four additional issues in its motion for limine. First, CA requested that evidence of either party's violation of the protective order be disallowed. This request is moot in light of the stipulation regarding alleged violations of the protective order filed April 20, 1993.

Second, CA requested I limit AFW from asserting at trial that CA is not the owner of all right, title and interest of any assets transferred to it from SPO. At the hearing on these motions, AFW agreed that it will not challenge the "chain of title" of these assets. In other words, AFW concedes that CA received whatever assets SPO had.

Third, CA sought an order limiting evidence of its settlement with the individual defendants in this case. The parties indicated in their briefs and at the hearing that there is no disagreement that the terms of CA's settlement are not admissible.

Fourth, CA has withdrawn its request that it be entitled to a presumption that the versions of the PC–Fund and Fundware programs that AFW destroyed would have demonstrated that AFW copied CA's code and concedes that issue should be addressed at the jury instruction conference.

D. *Defendant AFW's Motion in Limine.*

1. *Dayton Deposition Exhibit 231.*

██ AFW's first contention in this motion in limine is that CA should be precluded from introducing Exhibit 231 to the deposition of Jerome Dayton, AFW's managing agent.[8] Exhibit 231 is a letter dated August 18, 1998 from Dayton to attorney Gary Peterson containing allegedly privileged communications. AFW claims that it inadvertently provided Exhibit 231 to CA and that, as soon as this was discovered, AFW promptly asserted the privilege.

While these contentions are true, CA promptly moved to compel production of this letter. In an order dated November 21, 1991, Magistrate Judge Borchers granted the motion to compel, concluding that AFW had waived the privilege by allowing its expert, Ronald Mums, to see the letter. *See Boring v. Keller,* 97 F.R.D. 404, 406 (D.Colo.1983). AFW putatively appealed this ruling in a motion in limine filed on December 3, 1991. That motion was mooted by Judge Carrigan's entry of the pretrial order on September 25, 1992, which lists Exhibit 231 as one of CA's trial exhibits. (*See* Pretrial Order, Ex. A at 18.) Accordingly, Judge Carrigan's ruling is the law of the case and the pretrial order is controlling. Therefore, I deny the motion in limine as to Exhibit 231.

2. *Financial or Other Evidence Provided During Settlement Negotiations.*

AFW's second request in this motion in limine is that CA not be allowed to introduce certain financial information provided by AFW during settlement negotiations, relying on Fed.R.Evid. 408. These negotiations took place after CA had obtained a default judgment against AFW on the issue of liability. AFW provided CA with documents containing revenue and related statistics for certain types of software. The titles on some of these documents (indicating figures for software incorporating "SPO code") could be construed as an admission that AFW copied CA's software. AFW requests that these documents, or at least their titles, be precluded from evidence. CA responds that AFW produced the same documents with the same titles during discovery (*see* Pl.'s Exs. 95–106), and therefore cannot claim the protection of Rule 408.

██ Rule 408 of the Federal Rules of Evidence limits the introduction of evidence regarding offers or acceptance of compromises or settlements and conduct or statements made in compromise negotiations. It does not, however, "require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Fed.R.Evid. 408. Rule 408 is a preclusionary rule, not a discovery rule. It is meant to limit the introduction of evidence of settlement negotiations at trial and is not a broad discovery privilege. *NAACP Legal Defense Fund v. United States Dept. of Justice,* 612 F.Supp. 1143, 1146 (D.D.C.1985). Information which may not be admissible at trial under the rule is still discoverable so long as that information may lead to the discovery of other admissible evidence. *See Manufacturing Sys., Inc. v. Computer Technology, Inc.,* 99 F.R.D. 335, 336 (E.D.Wis.1983).

██ Here, AFW has not waived the protection of Rule 408 by producing the same documents it used in the parties' settlement negotiations during discovery. The titles of the documents could be construed as an admission of liability and are protected under Rule 408. The tabular information contained in the documents, however, is evidence that is otherwise discoverable. Therefore, AFW's request for the exclusion of the documents containing prejudicial titles is granted in part and denied in part. CA shall be permitted to introduce these documents into evidence subject to the requirement that all prejudicial titles be redacted. The parties shall attempt to reach agreement on the redaction before trial. Any dispute shall be promptly submitted to me for a ruling. Accordingly,

IT IS ORDERED THAT Plaintiff's motion for summary judgment as to Defendant's

---

8. AFW also sought to preclude CA's introduction of any charts prepared by its witness, James Schenck, included as Exhibits 292–295 to the deposition of John O'Brien. At the hearing on these motions, AFW withdrew this request.

**1532**

counterclaims is GRANTED as to the counterclaim for unfair competition and DENIED as to the request for the imposition of attorney fees under Colo.Rev.Stat. §§ 13–17–101 to –103; and

IT IS FURTHER ORDERED THAT Defendant's most recent motion to reconsider my order granting Plaintiff's motion to amend pretrial order is DENIED; and

IT IS FURTHER ORDERED THAT Plaintiff's motion in limine is GRANTED as to (1) evidence of CA's size, wealth and financial condition, (2) evidence of AFW's size, wealth and financial condition, (3) evidence as to CA's loss of the SPO programs, except as to evidence that Version 1.0 contains 79 programs altered in October, 1979, (4) evidence of CA's waiver of its copyright claim, (5) reference to CA's claim for injunctive relief;

IT IS FURTHER ORDERED THAT Plaintiff's motion in limine is DENIED as to (1) CA's request that AFW be equitably estopped from contesting the trade secret status of the SPO programs; and

IT IS FURTHER ORDERED THAT Defendant's motion is limine is GRANTED in part as to Plaintiff's Exhibits 95–106 as further explained herein and DENIED as to Dayton Deposition Exhibit 231.