**JOY TECHNOLOGIES, INC., A/S**
**Niro Atomizer, Plaintiffs,**

v.

**FLAKT, INC., Defendant.**

Civil Action No. 89–533–JJF.

United States District Court,
D. Delaware.

March 30, 1996.

Collins J. Seitz, Jr., of Connolly Bove Lodge & Hutz, Wilmington, Delaware; Robert A. Schroeder, Edward G. Poplawski, and Paul D. Tripodi, of Pretty, Schroeder, Brueggemann & Clark, Los Angeles, California, for Plaintiff Joy Technologies, Inc.

James C. Doub, of Miles & Stockbridge, Baltimore, MD, for Plaintiff A/S NIRO Atomizer.

Allen M. Terrell, Jr., and Frederick L. Cottrell, III, of Richards Layton & Finger, Wilmington, Delaware; Ronald J. St. Onge, William J. Speranza, and Stephen P. McNamara, of St. Onge Steward Johnston & Reens, Stamford, Connecticut, for Defendant Flakt, Inc.

## MEMORANDUM OPINION

FARNAN, Chief Judge.

The court held a bench trial in this matter on the issue of damages and, at the close of the evidence, the parties were given an opportunity to submit post trial briefing. The Court has considered and weighed the evidence adduced at the damages trial and reviewed the post trial submissions. This Memorandum Opinion shall constitute the Court's Findings of Fact and Conclusions of Law.

## I. BACKGROUND

### A. Procedural History

In 1989, Plaintiff Joy Technology Inc. ("Joy") sued Flakt Inc. ("Flakt") for infringement of United States Patent No. 4,279,873, entitled Process for Flue Gas Desulfurization ("the '873 patent"). In 1991, Niro A/S ("Niro") was joined as an involuntary Plaintiff. The case was bifurcated into liability and damages phases, and in December 1991 through January 1992 the liability issues were tried to a jury. On January 24, 1992, the jury returned a verdict in favor of Plaintiffs and against Defendant on the issue of infringement, and the Court entered judgment on the jury's verdict by Order dated February 3, 1992.

Subsequently, the Court denied Flakt's Post Trial Motions for Judgment As A Matter Of Law and for a New Trial. *See Joy Technologies Inc. v. Flakt Inc.*, 820 F.Supp. 802 (D.Del.1993). Flakt appealed the liability determination to the United States Court of Appeals for the Federal Circuit which affirmed the decision in favor of the Plaintiffs.

### B. Flue Gas Desulfurization Technology

In 1982, Joy and Flakt were competing bidders for contracts to be let by the Grand River Dam Authority ("GRDA") for a flue gas desulfurization ("FGD") system for use in connection with a coal-burning electric power generation plant it had decided to build, known as Unit No. 2. The GRDA was created by state statute in 1935 to provide wholesale electric power to Northeastern Oklahoma. (Plaintiff Damages Trial Exhibits, Vol. 12, Px 711, p. JO 9462). GRDA undertook to build two thermal generating units, GRDA1 and GRDA2, with a combined output of 1,010,00 kilowatts. (*Id.* at JO 94655). GRDA1 and 2 were designed to meet the Environmental Protection Agency's (EPA) rigid emissions standards and to be compatible with the environment.[1] *Id.* As

---

1. A general overview of how electricity is generated will be helpful in understanding the technology of the '873 patent. Initially, coal is mined and transported from the states of Oklahoma and Wyoming to GRDA, where it is emptied into a storage hopper, pulverized to the consistency of a fine powder and blown into a furnace or boiler.

*Id.* at JO 94660. Once in the boiler, the coal is subjected to extreme amounts of steam, pressure and temperature, causing the coal to combust and produce a gas made up of sulfur dioxide and fly ash. Before emitting this "flue gas" into the atmosphere it must be cleaned or scrubbed with lime to remove the sulfur dioxide. This process

such, the plants are equipped with a scrubber device used to clean the sulfur-laden flue gas before the gas enters the atmosphere. *Id.*

In 1982, when Joy and Flakt were competitively bidding for the GRDA contracts, essentially three types of FGD processes were available to remove sulfur dioxide from coal: 1) a wet scrubbing process, 2) a dry scrubbing, single pass process and 3) a dry scrubbing process with recycle. Plaintiff's expert, Mr. Karsten Felsvang, a chemical engineer specializing in the field of spray drying and particularly the use of spray drying for air pollution control, identified several important characteristics used to determine which FGD process to use at a particular site. (Trial Transcript, Felsvang, Vol. 1, p. 11). These characteristics include "the sulfur content of the coal, the availability of lime and other reagents at the location and also the disposal problems associated with that location". *Id.* As a general principle, Mr. Felsvang testified that "wet FGD systems are more suitable for the higher sulfur coals". (*Id.;* Trial Transcript, Neuscheler, Vol. 2, p. 358).

The primary difference between the two types of dry scrubbing processes is the amount of lime needed to run each process. (Trial Transcript, Felsvang, Vol. 1, p. 15). A single pass process consists of mixing the flue gas with a lime slurry. The lime slurry is sprayed into the flue gas where the lime reacts with the sulfur dioxide, removing the sulfur dioxide from the gas. The desulfurized gas consisting of fly ash, unreacted lime and other material is then emitted into the atmosphere. The process is referred to as "single pass" because the lime slurry is used once and unreacted lime is not recaptured and reused. Conversely, a recycle process attempts to conserve the amount of lime used by continually recycling the unreacted lime in the fly ash back into the lime slurry. Consequently, recycle processes tend to require less lime and can be more cost effective. (Trial Transcript, Felsvang, Vol. 1, pp. 14–19).

For a plant the size of GRDA, Mr. Felsvang stated that a single pass system would be more costly than a recycle system because it would use approximately three times more lime. *Id.* at 15. Mr. Felsvang also testified that a recycle system is more cost effective with respect to capital and electrical power consumption than a single pass system. However, he conceded that these costs were relatively insignificant compared to the cost of lime. *Id.* at 15. Moreover, Mr. Felsvang admitted that some single pass systems are less costly than some recycle processes. (Trial Transcript, Felsvang, Vol. 1, pp. 111–13, 127).

### C. The GRDA Specification

The GRDA bid preferred a recycle process in which "recycle material (consisting of fly ash, unreacted lime, calcium sulfite and calcium sulfate) . . . [is] added to the slurry mixture to reduce lime consumption." (Defendant Exhibit 1065 at 2–42). However, Mr. Robert Morford, Joy's Senior Vice President of Business Development, testified that although the GRDA bid specification contained several references to recycle, he believed that the bid left an option for single pass process bids as well. (Trial Transcript, Morford, Vol. 1, p. 157). GRDA also provided its bidders with a comprehensive specification for the air quality control system to be used at GRDA1 and 2. (See Defendant's Exhibit 1065). Benham–Hollway (BH), the architectural and engineering company hired by GRDA who wrote the specification for the FGD system, stated in the specification that:

"Designing, furnishing, delivering, storing, erecting and start up of a complete air quality control (AQC) system consisting of, but not limited to, a lime spray dryer scrubber; electrostatic precipitator; fly ash handling; lime unloading, storage, handling and preparation; interconnecting flue gas duct work; a complete stack monitoring system for EPA compliance; and all related auxiliary systems and structures".

(Defendant Exhibit 1065 at 2–1).

The BH specification also identifies the detailed functional requirements for the dry scrubbing particulate removal system. (De-

---

is referred to in the industry as Flue Gas Desulfurization ("FGD"), and it is the subject of the '873 patent.

**800**

fendant Exhibit 1065 at 2–32—2–50). The BH specification references a system which "shall include all necessary equipment for preparing and supplying the reagent slurry to the rotary spray atomizers in the scrubber modules ... recycle material (consisting of fly ash, unreacted lime, calcium sulfite, and calcium sulfate) *may as an option* be added to the slurry mixture to reduce lime consumption. (Defendant Exhibit 1065, p. 2–42—2–43). (Emphasis added). The specification further provides that "solids collected in the absorber modules and the precipitator may be recycled to the slurry as required to minimize lime consumption while maintaining required SO2 and particulate removal. The recycle system *if provided* shall include a recycle material feed bin to receive particulate from the ash systems and wait belt feeder to meter recycle solids flow to the slurry." (*Id.* at 2–44) (Emphasis added).

GRDA specified that the work would be awarded as a single contract to "the lowest responsible bidder for the work as determined by evaluation". (Plaintiff's Damages Trial Exhibit, Vol. 12, Px 712 at B003583).

*D. The Flakt Bid*

Flakt submitted a bid on the GRDA project in March 1982 and was awarded the contract in May 1982. Flakt bid a dry scrubbing process with a recycle component. Flakt describes its FGD cleaning system in Section 3 of its bid as follows:

3.2 PROCESS DESCRIPTION

. . .

The gas leaves the boiler units and enters the top each spray dryer reactor. At the top of the reactor, the gas is equally distributed to each of three inlet dispersers. The gas velocity accelerates as it passes through the dispersers. At the discharge of the disperser, where a finely atomized spray of liquor (comprised of water, lime slurry, and recirculated ash and reaction products) is introduced, the gas velocity is abruptly reduced. This causes a very high degree of turbulence which serves to assure that the droplets become intimately mixed with the gas.

As the gas exits the disperser outlets and travels down the reactor chamber, the sulfur dioxide reacts with the calcium hydroxide contained in the droplets to form calcium sulfite/sulfate reaction products. At the same time, the heat of the gas causes the water in the spray droplets to evaporate, thereby leaving a dry particulate residue suspended in the gas stream. Some of the dry reaction products and some of the fly ash fall out of the gas stream and are discharged through the reactor bottom. This material is recirculated directly back into the absorber feed liquor.

. . .

Reagent slurry is prepared on a ball mill type slaker. Pebble lime and water are mixed isothermally in the slaker. The calcium oxide reacts with water to form calcium hydroxide (lime slurry). Grit, or unreacted lime and inerts, are separated from the slurry prior to being mixed with the reactor liquor feed.

The reactor liquor feed is prepared on the feed tank. Water is added, according to evaporation requirements; lime slurry is added according to $SO_2$ absorption (removal efficiency) requirements; and reaction products and fly ash are added based on maintaining a 20–40% solids liquor feed stream. A progressing cavity pump is used to transport the liquor to the nozzles.

(Plaintiff's Damages Trial Exhibit, 716, pp. B002457–B002460).

## II. *DISCUSSION*

In response to Plaintiffs' claim for damages, Flakt has asserted a laches defense which seeks to ban any damages recovery by Plaintiffs. Before discussing Plaintiffs' theories, the Court will address Flakt's laches defense.

*A. Laches and 35 U.S.C. § 286*

Joy and Flakt submitted bids for GRDA in March 1982, and Joy reviewed Flakt's bid in May 1982. In particular, Joy reviewed Section 3 of Flakt's bid, which described the recycle system Flakt intended to use at GRDA. While the wording of Section 3 leaves little doubt that Flakt was bidding a recycle process, Joy contends that it was unable to determine whether Flakt's recycle process infringed the '873 patent because no flow diagrams were included. (Trial Tran-

script, Neuscheler, Vol. 2, p. 374). Joy engineer Roger C. Neuscheler testified that because Section 3 of Flakt's bid is open to more than one interpretation, without flow diagrams, Joy was unable to determine whether Flakt's recycle process infringed the '873 patent in May 1982.

Flakt's proposal described the lime slurry preparation in the following manner, "The reactor liquor feed is prepared in the feed tank. Water is added ... lime slurry is added ... and reaction products and fly ash are added based on maintaining a 20–40% solids liquor feed stream." Flakt proposal further provides that the liquor spray is comprised of "water, lime slurry, and **recirculated ash and reaction products ...**" (Plaintiff's Damages Trial Exhibit 716, p. B002457–59) (Emphasis added). Mr. Neuscheler testified that, for instance, a potential non-infringing interpretation of Flakt's proposal is the reaction products and fly ash are added to the liquor feed stream after the water and lime slurry mixture is prepared. At trial, Mr. Neuscheler testified as follows:

Q. ... What is the specific recycle that is involved in the '873 patent?

A. As I remember from the '873 patent, the recycle involves removing a portion of the dust which is collected in the dust collector, bringing it back and adding it to a tank in which you would also mix in slake lime and water. And that the mixture of water, slake lime and recycle would then be added as a contiguous stream to the atomizer.

. . . . .

Q. ... Am I correct that your testimony has been that there may be other recycle processes that were different than the recycle involved in the Niro patent?

A. ... If Flakt chose to inject the dry material into the duct at any point without mixing it with the lime and the water first, they would have effected recycle without infringing on the patent.

. . . . .

Q. This presupposes a process in which none of the recycle is being added to the lime slurry, but in which all of the recycle is being injected into the duct?

A. That is correct.

. . . . .

Q. And so there would be no recirculation of reaction products including fly ash to the lime slurry, but instead the fly ash would come all the way back here and be introduced or dry injected into this flue gas in the duct?

A. Yes.

Q. And this tank would always remain simply water and lime, right? No recycle is being added to it?

A. Theoretically, yes.

. . . . .

Q. Now, were there any other possibilities of recycle processes that were not the recycle involved in the Niro patent?

A. It would also have been possible to slurry the recycle powder with water and inject it into the top of the spray dryer through one or two of the multiple atomizers without mixing it with the lime and the water.

(Trial Transcript, Neuscheler, Vol. 2, pp. 377–79).

Joy contends that a memo from Flakt's General Counsel to Joy, dated November 23, 1983, reinforced Joy's opinion that Flakt was not infringing the '873 patent. The memo provides in pertinent part:

We take your offer to GRDA of a license as a very unsubtle suggestion that the FGD system to be used in the GRDA project will infringe Niro's U.S. Patent No. 4,279,873 entitled "Process for Flue Gas Desulfurization". Flakt is fully aware of U.S. Patent No. 4,279,873, and it is not our policy to infringe on valid patents of others.

(Defendant's Damages Trial Exhibit 1145).

Flakt contends that Joy knew of Flakt's infringement in May 1982 and that Joy's delay in bringing suit until 1989 was excessive and unreasonable. Flakt argues that it continued to invest in dry FGD recycle contracts, thus placing Flakt in a position of financial risk which could have been avoided if Joy had brought suit in a timely fashion. Flakt contends that Joy should be barred

802

from receiving damages under the doctrine of laches and/or 35 U.S.C. § 286.

■ The doctrine of laches is an equitable remedy subject to the Court's discretion and dependant upon the particular facts of each case. *Bott v. Four Star Corp.,* 807 F.2d 1567 (Fed.Cir.1986). Laches bars recovery for damages incurred before the complaint was filed. To prove laches a defendant must show: 1) plaintiff's unreasonable and inexcusable delay in asserting the claim and 2) prejudice or injury to the defendant resulting from the delay. *Eli Raitport, et. al., v. United States,* 33 Fed.Cl. 155, 159 (Fed.Cl.1995). A patent owner's delay in filing suit is measured from the time he learns of the infringement until the time he files suit. *Id.* It is for the trial court to determine when the patent owner knew or should have known of the alleged infringement. *Meyers v. Brooks Shoe Inc.,* 912 F.2d 1459 (Fed.Cir.1990). A six year delay is considered presumptively unreasonable and shifts the burden to the patent owner to show an excuse or lack of injury. *Bott,* 807 F.2d at 1575.

■ In this case, Joy filed suit September 28, 1989. The Court finds that Joy first gained definitive knowledge of Flakt's infringement of the '873 patent in October 1988 after John Buschmann, a chemical engineer in Flakt's Precontract Department, presented a paper detailing Flakt's recycle process. (Trial Transcript, Morford, Vol. 2, p. 240). After learning the details of Flakt's recycle process from Mr. Buschmann's presentation in October 1988, Joy filed suit in September 1989, approximately one year later. The Court credits the testimony of Mr. Neuscheler that the Flakt proposal for the GRDA contract in 1982 could reasonably be interpreted as involving a non-infringing system. Further, when contacted by Joy, Flakt represented it was aware of the '873 and, at least, implied that its process did not infringe the patent. On this record, the Court concludes that Joy did not delay in bringing suit and Flakt's laches defense is meritless.

Flakt also contends that recovery by Joy concerning the GRDA contract should be barred pursuant to 35 U.S.C. § 286. Section 286 provides:

Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

The Court of Appeals for the Federal Circuit has determined that § 286 is not a statute of limitations "in the sense that it defeats the right to bring suit ... In the application of § 286, one starts from the filing of a complaint or counterclaim and counts *backward to determine the date before which infringing acts* cannot give rise to a right to recover damages." *Standard Oil v. Nippon Shokubai Kagaku Kogyo Co.,* 754 F.2d 345, 348 (Fed.Cir.1985).

■ Thus, § 286 bars recovery of damages prior to September 28, 1983. Flakt argues that § 286 should be interpreted to bar recovery completely if the infringement occurred more than six years prior to the filing of the complaint. However, in *Standard Oil,* the Federal Circuit differentiated single occurrence infringements and "continuing the use" of a patented process. *Id.* at 348. In the instant case, Flakt's infringement of the '873 patent was not a single occurrence but rather a continuous use of the patented process. Therefore, Joy is entitled to damages resulting from Flakt's continuous infringement of the '873 patent during the six year period preceding filing of the Complaint. *Id.*

Having concluded that Plaintiffs are not barred from recovering their damages, the Court will now proceed to determine the appropriate measure of damages to be applied in this case.

### B. Lost Profits

■ In a patent infringement case, a patent owner is entitled to damages equal to either lost profits from lost sales or a reasonable royalty that would have been received from licensing the patent. *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156–57 (6th Cir.1978). In order to obtain damages for lost profits the patent owner must prove four elements: (1) demand for the patented product, (2) an absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to

exploit the demand for the patented product and (4) the amount of profit the patent owner would have made. *Id.*

### 1. Demand For The Patented Product

■ The Court finds that Joy has proven that there was generally and in particular a significant demand for the FGD system described in the '873 patent. The liability phase of this case involved two FGD contracts, GRDA 1 and 2 and Ultrasystems I and II, awarded to Flakt over Joy. The Court finds that the GRDA bid specification and the BH flue gas specification preferred an FGD system with recycle capability. (Defense Damages Trial Exhibit 1065). The Ultrasystems bid specification was similar in its requirements. In view of these bids, the Court finds that Plaintiffs have adduced evidence sufficient to establish a demand for the desulfurization process taught in the '873 patent.

### 2. Absence Of An Acceptable Non–Infringing Substitute

■ Joy must also prove an absence of acceptable, non-infringing substitutes for the patented product. Whether a product is an acceptable non-infringing substitute is a function of the purchaser's needs. *Smith-Kline Diagnostics, Inc. v. Helena Laboratories Corp.,* 926 F.2d 1161, 1166 (Fed.Cir. 1991). Thus, a difference in product/process technology does not automatically disqualify a product as an acceptable non-infringing substitute. *Id.* The Court looks to the purchaser's motivation, first, then to the product features in determining whether a substitute exists. *Id.*

### a. Dry v. Wet FGD System

Turning to the purchaser's motivation, GRDA conducted a Best Available Control Technology (BACT) study in order to determine which type of air pollution control system would be best suited for its plant. (Trial Transcript, Brown, Volume 3, p. 453). GRDA is required by industry standards to conduct a BACT study to ensure that the proposed plant meets national ambient air quality standards. (*Id.*). The BACT study concluded that a dry FGD system was supe-

rior to a wet system at GRDA because a wet scrubber would have higher waste disposal and energy consumption costs. (*Id.* at 456). Therefore, on the basis of the BACT study, GRDA specified a dry FGD system in the bid specification supplied to all vendors. (Defense Damages Trial Exhibit 1065).

Flakt's Senior Vice President Donald D. Boyd testified that a wet system was suitable for GRDA despite the fact that GRDA planned to use low sulfur coal. Mr. Boyd identified three low sulfur coal plants using wet systems, thus challenging the general understanding in the industry that wet systems are better suited to high sulfur coals. (Trial Transcript, Boyd, Vol. 3, p. 591). Citing this evidence, Flakt argues that wet systems were a viable substitute for dry systems site. (See Trial Transcript, Morford, Vol. 2, p. 316; Costello, Vol. 3, p. 524).

However, the fact that a wet system may be used in some low sulfur coal projects does not mean that a wet system was an acceptable substitute for a dry system at GRDA. A purchaser's choice of an air cleaning system is contingent upon numerous site specific characteristics in addition to the sulfur content of the coal. Considering all the factors cited in the record concerning the appropriate type of system for GRDA, the Court finds that GRDA preferred and required a dry FGD system with the lowest evaluated cost. The Court finds that a wet system would not have been an acceptable substitute for the '873 patent process due to the high sulfur content of the coal to be used at GRDA and the results of the BACT analysis. (Trial Transcript, Felsvang, Vol. 1, p. 12). Further, the Court finds ample support in the record that a wet system would have been more costly than a dry system. (*Id.*, Trial Transcript, Brown, Vol. 3, p. 456).

### b. Single Pass v. Recycle Process

The more difficult issue is whether a single pass process was an acceptable non-infringing substitute for the recycle process taught in the '873 patent and ultimately selected by GRDA. A careful reading of the contract convinces the Court that GRDA desired a dry scrubbing process with or without recycle. (*See* Defense Exhibit 1065). In support

of this finding the Court notes language in the contract relative to this question such as "may as an option" and "if provided" in reference to specifications detailing functional requirements for the dry scrubbing particulate removal system. (Def. Ex. 1065). Additionally, GRDA specified that the contract would be awarded to the bidder with the lowest total evaluated cost. As such, consideration must also be given as to whether Flakt, or another vendor, was capable of supplying a single pass process with a lower total evaluated cost than Joy's recycle process.

Mr. Felsvang contends that Flakt's single pass process could not be less expensive than Joy's recycle process because it requires three times as much lime as the recycle process. (Trial Transcript, Felsvang, Vol. 1, p. 80–137). In this regard, Mr. Felsvang determined Flakt's theoretical lime consumption rate by creating a mock single pass dry scrubber for a plant the size of GRDA. (*Id.* at 81). By estimating the solids content of the slurry, the size of the droplets, the amount of time needed to dry the droplets, the inlet temperature, and a number of other variables, Mr. Felsvang estimated that Flakt's single pass process would consume 47,300 pounds of lime per hour with a stoichiometric ratio ("SR") of 3.25.[2]

By comparing these values with Joy's recycle consumption rates of 25,232 pounds of lime per hour and a SR of approximately 1.55, Mr. Felsvang concluded that Joy's recycle process would have been less expensive than Flakt's single pass process. (Trial Transcript, Felsvang, Vol. 1, p. 18)

Flakt criticizes Mr. Felsvang's mock process, contending that Mr. Felsvang's assumed delta t of 35'F was too high and should be 20'F, thus reducing total lime consumption. (Trial Transcript, Buschmann, Vol. 4, pp. 802–03). On cross examination, Mr. Felsvang conceded that the hypothetical Flakt system was derived entirely from liter-

ature since a single pass system the size of GRDA did not exist. Mr. Felsvang also admitted that the study contained numerous assumptions about Flakt's single pass process that may have been incorrect. Finally, Mr. Felsvang acknowledged that the assumed correction factors for the sulfur content of the coal, the type of dust collector and the delta t affected his estimates of the single pass process' lime requirements. (Trial Transcript, Felsvang, Vol. 1, p. 23–25, 29–33).

Flakt also asserts that a single pass process is cost competitive with a recycle process. Prior to submitting its bid, Flakt ran a series of tests at a pilot plant at the University of Tennessee to determine the single pass and recycle stoichiometry for GRDA. (Trial Transcript, Fiedler, Vol. 3, p. 628). As a result of these tests, Flakt bid a recycle process with a 1.2 SR and estimated a single pass process at 1.5–1.6 SR.[3] At a 1.5 SR for a single pass process, Flakt contends that its single pass process still would have been less expensive than Joy's 1.55 SR recycle bid. (Trial Transcript, Boyd, Vol. 3, p. 597; Fiedler, Vol. 3, p. 635–44).

As further evidence that single pass is cost competitive with recycle, Flakt offers two contracts, Bechtel Indiantown and SEI Birchwood, in which the customer selected Flakt's single pass process over Joy's recycle process. (Trial Transcript, Boyd, Vol. 3, p. 602; Buschmann, Vol. 4, p. 790).

On this record, the Court finds that a single pass process was an acceptable substitute for a recycle process at GRDA. The Court is persuaded that GRDA wanted a dry process in which a single pass or recycle process was optional, and the Court finds a dry single pass process was available as an acceptable non-infringing substitute. In further support of this finding, the Court also credits Flakt's pilot plant tests at the University of Tennessee, particularly the GRDA's performance tests in which Flakt's SR and

---

**2.** The stoichiometric ratio ("SR") measures the amount of lime necessary to remove the sulfur dioxide. The higher the SR the less efficient the FGD system. (Trial transcript, Felsvang, Vol. 1 at p. 17–18).

**3.** Flakt guaranteed an extremely low stoichiometry in reliance on the research of Mark Fiedler. Mr. Fiedler quantified the percentage of SO2 that is not released from coal into the gas stream and reduced the inlet SO2 level accordingly. This reduction corresponds to a reduction in lime consumption and the SR.

lime consumption rates were less than Flakt's guaranteed rates. (*See* Trial Transcript, Fiedler, Vol. 4, p. 690).

### 3. Manufacturing and Marketing Capability

To meet the manufacturing requirement, Joy must demonstrate that it had "the manufacturing and marketing capability to exploit the demand ...". *Panduit*, 575 F.2d at 1156. The Federal Circuit has construed manufacturing capability to mean that the patent owner either had existing or potential capacity to meet the demand. *Bio–Rad Laboratories v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed.Cir.1984).

Joy's Director of Technology, Walter Brown, testified that Joy had the capacity and the engineering resources to execute the GRDA contract, and only upon losing the contract to Flakt did Joy lose some of its engineers. (Trial Transcript, Brown, Vol. 3, p. 438–40). Mr. Brown likened Joy's business to that of an engineering contractor who does the design engineering but subcontracts the labor and materials. *Id.* Mr. Brown also testified that Joy's project management role enables it to accommodate additional contracts easily, unlike a manufacturing facility of finite capacity. *Id.* Finally, Mr. Brown testified credibly that to bid for the GRDA contract, Joy was required to post a substantial bond which would have been forfeited if Joy won the contract but chose not to accept it. *Id.* On this record, the Court finds that Joy had the existing manufacturing and engineering capability to execute the GRDA contract, especially in light of the market slow-down in the mid–1980's. (Trial Transcript, Brown, Vol. 3, p. 440).

### 4. Proof of Amount of Lost Profit

Finally, to recover on a theory of lost profits, Joy must show "the amount of profit [it] would have made" had it won the GRDA contract. *Panduit*, 575 F.2d at 1156. In its simplest form, the measure of lost profits or the profit margin is the difference between the selling price and the cost to build an FGD plant. Courts may compare the profits of the infringer with the patent owner's profit margin to determine the reasonableness of the latter. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 673 (Fed.Cir.1988), *on remand*, 709 F.Supp. 821 (N.D.Ill.1989), 714 F.Supp. 899 (N.D.Ill.1989). Where there is a doubt as to the profit margin, the Court must construe the facts in favor of the patentee. *Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed.Cir.1990).

Joy relies on the expert testimony of Mr. John J. Costello to establish its lost profits calculations at GRDA. In the years preceding the GRDA contract, Joy realized actual profit margins ranging from 16.0% on Cogentrix to 24.7% on Antelope Valley 2 ("AV 2"). Joy contends that GRDA is most similar to AV 2 in size and complexity, and for that reason, Joy adopts AV 2's actual gross margin for GRDA's estimated gross margin. (Trial Transcript, Morford, Vol. 2, pp. 302–05). Based upon the profit margins realized at AV 2, Mr. Costello calculated gross profit margins on GRDA for Joy at 24.7% and Niro at 48.8%. (Trial Transcript, Costello, Vol. 3, p. 483, 492). Mr. Costello opines that this profit margin would have resulted in lost profits for Joy of $17.6 million and for Niro of $4.8. (Trial Transcript, Costello, Vol. 3, pp. 491, 503).[4]

Flakt argues that basing Joy's lost profits at GRDA on its previous experience at AV 2 is inappropriate. First, Flakt argues that the two projects are significantly different. For example, AV 2 uses a baghouse dust collector and GRDA uses an electrostatic precipitator. A baghouse dust collector uses less lime, and therefore costs less to operate than an electrostatic precipitator. (Trial Transcript, Morford, Vol. 2, p. 302). Second, Flakt contends that the costs associated with AV 2 would be significantly less than GRDA because the design for AV 2 was adopted from AV 1, whereas GRDA required the creation of an original design. (*Id.* at 305). Third, Flakt contends that Joy's gross margin is overstated because Joy erroneously included sales from future spare parts. (Trial Transcript, Boyd, Vol. 3, p. 590). Flakt contends that prior experience with bids at

---

4. Mr. Costello factored out profits for the first year, 9/82 through 9/83, based on Flakt's actual percentage completion rate. (Trial Transcript, Costello, Vol. 3, pp. 498–99).

AV 2, Basin Electric, Laramie River and Colorado UTE show that such sales would go to the associated spare parts subcontractor. (Trial Transcript, Boyd, Vol. 3, p. 590). Fourth, Flakt contends that Joy's lost profits calculations contained mathematical and logical errors significantly overstating Joy's lost profits. (*Id.* at 536; Trial Transcript, Ludington, Vol. 6, p. 1044). Specifically, Carol A. Ludington, Flakt's expert, testified that Joy's gross margin, borrowed from AV 2, is overstated because Joy calculated it using "a nonescalated revenue calculation to get the gross margin times an escalated price." (Trial Transcript, Ludington, Vol. 6, p. 1048). Ms. Ludington testified that the use of nonescalated and escalated numbers in the same calculation is akin to comparing apples to oranges. *Id.* According to Ms. Ludington, the proper calculation shows that Joy's gross profit margin would have been 22.22%. (*Id.*).

Considering all the evidence offered with regard to the relevant factors, the Court finds that Joy has not satisfied its burden for a damages award based on lost profits. First, Joy failed to establish that there. are no acceptable non-infringing substitutes for the '873 patented process. The Court finds that a single pass dry scrubbing process was an acceptable substitute for the GRDA project, and that such a process would have been cost competitive with Joy's recycle process. Additionally, the Court is not convinced that Joy's profit margin at AV 2 is transferrable to GRDA. The record is replete with evidence that GRDA was unique in terms of its size and complexity, and, therefore, was likely to bring a whole host of challenges not previously encountered by Joy. Additionally, Joy's use of AV 2's high profit margins is not persuasive, and the Court finds Ms. Ludington's testimony criticizing Joy's gross margin calculations credible. For these reasons, the Court declines to determine damages based on a lost profits calculation.

### C. Reasonable Royalty

Where a patentee is unable to prove lost profits, 35 U.S.C. § 284 provides that the Court shall award not "less than a reasonable royalty." Section 284 provides a floor below which the damages award shall not fall. The Federal Circuit has determined that a reasonable royalty is "an amount 'which a person, desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article, in the market, at a reasonable profit.'" *Panduit*, 575 F.2d at 1157–58, *citing, Goodyear Tire and Rubber Co. v. Overman Cushion Tire Co.*, 95 F.2d 978, 984 (6th Cir.1937). A reasonable royalty must be calculated using the market conditions on the date infringement began and not by today's standards. *Id.* at 1158. In making this calculation, the Court may rely upon a number of factors in determining what would have been a reasonable royalty in a hypothetical licensing negotiation between the parties. These factors include:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory and line of business, or whether they are inventor and promotor.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent, its .commercial success and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, such as, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement . . .

*Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).

 In attempting to calculate a reasonable royalty in this case, the Court relies on the opinion testimony of qualified experts and factors two, five, seven, eight, nine, and fifteen. The experts retained by the parties both use essentially the same methodology to calculate a reasonable royalty, however, not surprisingly, their resulting royalty figures are significantly different. The agreed upon methodology for calculating a reasonable royalty is to take a percentage of the lime savings realized between recycle and single pass. (Trial Transcript, Morford, Vol. 1, p. 176; Friedlander, Vol. 4, pp. 854, 56–59, 75).

Specifically, Dr. Friedlander, Intellectual Property consultant for Flakt, stated that a reasonable royalty is a percentage of the lime savings between recycle and the next best technology where the percentage is massaged relative to market conditions. (Trial Transcript, Friedlander, Vol. 4, p. 875). Dr. Friedlander testified that, unlike other industries, the FGD industry does not have a customary or standard royalty, but rather relies on sound business judgment. (*Id.* At 946).

Turning to Joy's royalty calculation, Joy contends that a reasonable royalty for the GRDA license is approximately $21MM. (Trial Transcript, Morford, Vol. 1, p. 219; Costello, Vol. 3, p. 517). Joy contends that $21MM is reasonable because it is ⅓ of the savings between the recycle process and single pass process that Joy would have sought in a license in 1982 for the right to bid a recycle system. (Trial Transcript, Morford, Vol. 2, p. 219). Joy argues that Flakt could build the $21MM into its bid price of $69MM and still underbid Joy's $93MM. This Joy argues would enable Flakt to pass on the royalty cost to GRDA and still maintain its competitiveness. (Trial Transcript, Morford, Vol. 2, p. 225).

In response, Dr. Friedlander testified that he would not calculate a reasonable royalty by taking ⅓ of an estimated $64MM savings. (Trial Transcript, Friedlander, Vol. 4, p. 854). Dr. Friedlander contends that a more realistic royalty is $1.2MM, which is 15% of an estimated $8MM savings. (*Id.* at 878–79). Dr. Friedlander testified that Flakt's estimated royalty as a percentage of total cost ($70MM) is 1.7%, and that the 14% estimated royalty rate argued by Joy is completely out of line with industry standards. (*Id.*).

At trial, testimony was presented concerning a 1986 Flakt–Niro agreement in Europe for "similar technology, same parties, different geography" which Dr. Friedlander admitted influenced his royalty calculations. (*Id.* at 882–86). Dr. Friedlander stated that the royalty in the 1986 European agreement should be the same or slightly lower than the 1982 North American agreement due to the differences in each continents environmental regulatory requirements. (*Id.*). Further,

Dr. Friedlander opined that in 1982, North America's FGD market was more robust than Europe's because the United States was imposing tighter air pollution laws that allowed FGD manufacturers to garner a higher royalty. (*Id.*) The 1986 royalty as a percentage of total cost is 3% on sales using Niro systems and 1% on sales using Flakt systems. (*See* Plaintiff's Exhibit 29). When asked to speculate on the maximum royalty Flakt would be willing to pay in 1982 given Joy's apparent monopoly of the recycle process, Dr. Friedlander said 3% of total cost. (Trial Transcript, Friedlander, Vol. 4, p. 955).

On the record before it[5], the Court finds that a reasonable royalty under the circumstances of a licensing negotiation between Joy and Flakt in 1982 for a license to utilize the '873 patent recycle process at GRDA is 25% of the savings between the use of the '873 recycle process and a single pass process. The Court finds for purposes of setting the royalty dollar amount that the estimated lime savings would be approximately $60MM. (Morford, Tr. pp. 163–178, 180–184; Friedlander, Tr. pp. 854–859, 912–915).

### D. Prejudgment Interest

■ In addition to a reasonable royalty, Joy seeks prejudgment interest measured at the rate the patentee actually paid for borrowed funds. (Trial Transcript, Costello, Vol. 3, p. 505–06, 524). The law provides for prejudgment interest "where necessary to afford the plaintiff full compensation for infringement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). The Supreme Court has further held that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award." *Id.* at 657, 103 S.Ct. at 2063.

■ In setting the rate for prejudgment interest, courts have used: the prime rate, the prime rate plus a percentage, the U.S. Treasury bill rate, the state statutory rate, corporate bond rates, a set consumer credit rate, a set percentage rate, the rate the

patentee actually paid for borrowed funds and others. *See* Donald S. Chisum, *Patents*, Vol. 5, § 20.03[4], pp. 290–295. The trial court has discretion both in deciding whether to award interest and in setting the rate. *General Motors Corp.*, 461 U.S. at 657–58, 103 S.Ct. at 2063–64.

■ Flakt contends that prejudgment interest, if awarded, should be based on the Treasury Bill rate, resulting in an interest calculation of approximately $15–20MM. (Trial Transcript, Ludington, Vol. 6, p. 1063). Flakt argues that Joy's suggested rate should not be used given the inconsistencies in the factual underpinning supporting the calculation of the rate. (*Id.* at 1056–62).

The Court will grant prejudgment interest at the Treasury Bill rate.

### E. Willful Infringement

Joy contends that this is an exceptional case entitling it to an award of treble damages and attorney fees because Flakt willfully infringed the '873 patent. Joy contends that Flakt failed to obtain competent legal advice on the validity of the '873 patent, in writing, prior to submitting its bid for the GRDA project. (D.I. 680 at 40). Joy argues that Flakt's conduct amounts to willful infringement because they failed to exercise due care to determine whether they were infringing the '873 patent. *Id.* Additionally, Joy dismisses Flakt's assertion that it relied on the oral opinion of counsel as a convenient fabrication for the purpose of litigation. *Id.*

In response, Flakt contends that it did not willfully infringe the '873 patent. Flakt maintains that in March 1982, patent counsel Kenyon and Kenyon, advised Flakt in a series of meetings that the '873 patent was invalid due to obviousness and anticipation. (Trial Transcript, Olsson, Vol. 5, p. 962; Farrington, Vol. 5, p. 1031). On advice of counsel, Flakt contends that it submitted a bid with recycle technology in the belief that it did not infringe the '873 patent. (*Id.*).

■ The Court is convinced that Flakt: 1) had knowledge of the '873 patent prior to submitting its bid for GRDA; 2) was aware

---

**5.** The Court's previous discussion of the facts and circumstances surrounding the GRDA bids is intended to implicate the relevance of *Georgia-* *Pacific* factors two, five, seven, eight, nine and fifteen.

that the recycle process it intended to utilize infringed the '873 patent; 3) did not have a written or oral opinion from counsel advising that its recycle process was noninfringing and; 4) was advised by counsel to negotiate a license for the '873 patent recycle process. This evidence persuades the Court that Flakt's infringement was willful, and therefore, the Court will order a 100% increase in the damages award and attorney fees.

### F. Ultrasystems

In addition to GRDA, Joy seeks damages for Flakt's infringement of the '873 patent in Ultrasystems I and II ("US I and II"). Ultrasystems is a series of four boilers located at four different locations. Flakt was awarded the FGD contract for two of the four boilers. (Trial Transcript, Brown, Vol. 3, p. 442). The US I and II contracts sought a dry system with recycle, and Flakt contends that Ultrasystems would have opened the bidding to single pass process, if, as occurred in 1988, only one manufacturer placed a recycle bid. (Trial Transcript, Boyd, Vol. 3, pp. 600–01). US I and II differed from GRDA in several other ways. For example, US I and II specified a fabric filter rather than an electrostatic precipitator dust collector, and the chloride content of their coal was higher. (Trial Transcript, Buschmann, Vol. 4, p. 779). Mr. Buschmann stated, and Flakt's pilot plant tests supported, that both of these factors would result in lower lime consumption rates. Flakt bid a 1.1 SR for either single pass or recycle on US I and II, which was .1 lower than their recycle SR bid on GRDA. (Trial Transcript, Buschmann, Vol. 4, p. 784). In contrast, Mr. Felsvang estimated that a single pass process at US I and II would have a 2.0 SR, applying the same methodology as he did for GRDA. (Trial Transcript, Felsvang, Vol. 1, p. 34).

Contending that they have met the *Panduit* factors, Joy seeks lost profits on US I and II of between $1.2 MM (Trial Transcript, Morford, Vol. 2, p. 212) and $2.5MM. (Trial Transcript, Costello, Vol. 3, p. 490). Alternatively, Joy seeks a reasonable royalty equivalent to a percentage of the savings realized on the recycle process. (Trial Transcript,

Morford, Vol. 1, p. 179). Specifically, Joy estimates that a reasonable royalty would be $800,000 to $1.2 million, based on a calculation of one third the difference in evaluated cost between recycle and single pass. (*Id.* at 180).

In response, Flakt contends that Joy is not entitled to lost profits because Joy failed to carry its burden that a non-infringing substitute was unavailable. Flakt concedes that a wet system is not a viable substitute for US I and II, but argues that if their recycle system had been rejected, Ultrasystems would have still selected their single pass rather than Joy's recycle. (Trial Transcript, Buschmann, Vol. 4, pp. 789, 840). Consequently, Flakt urges a reasonable royalty calculated in the same manner as the GRDA royalty, 2% of the contract price or $110,000.

The Court concludes that Joy has failed to establish its entitlement to lost profits as the measure of damages for Flakt's infringement of the '873 patent for US I and II. The Court believes that Flakt is correct when it claims that Ultrasystems would have accepted a single pass process had Joy been the only bid with a recycle process. The Court predicates this finding on its assessment that Flakt's single pass process with a 1.1 SR was very competitive and would have been selected over Joy's recycle process. Under these circumstances, Joy is unable to demonstrate its ability to satisfy the *Panduit* factors, and therefore, the Court will set a reasonable royalty.

In the absence of an industry standard range, the Court has considered the *Georgia–Pacific* factors relative to US I and II as it did in GRDA. The glaring difference between a licensing negotiation that may have occurred for Ultrasystems, as opposed to GRDA, is the likelihood that Flakt would have been awarded the contract with use of a noninfringing single pass process. As stated, the Court believes this fact alone significantly affects the setting of a reasonable royalty for the US I and II infringement. Thus, the Court concludes that Joy is entitled to a reasonable royalty of 8% of the contract price.[6]

6. In its papers, Joy apportioned the damages

between itself and Niro. The Court has not and

### III. *CONCLUSION*

Plaintiffs are requested to submit a Proposed Final Order in accordance with this Memorandum Opinion no later than April 18, 1996.˙ Defendant may submit its comments on the Proposed Final Order no later than April 25, 1996.

leaves any division of the damages award to the

Plaintiffs.